IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| KEON V. LIPSCOMB,<br><br>  Plaintiff,<br><br>v.<br><br>KYLE A. BRUMLEVE, JILIAN CRANE, and ANTHONY WILLS,<br><br>  Defendants. | Case No. 23-cv-3959-NJR |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Plaintiff Keon V. Lipscomb, an inmate of the Illinois Department of Corrections ("IDOC") who is currently incarcerated at Menard Correctional Center, brings this action for deprivations of his constitutional rights pursuant to 42 U.S.C. § 1983. The case is currently before the Court on Lipscomb's motion for temporary restraining order ("TRO") (Doc. 2). Lipscomb also filed a motion for help (Doc. 9), which the Court construed as a supplement to his original motion for injunctive relief. Defendant Anthony Wills filed a response to the motion (Doc. 21). Lipscomb filed a reply brief (Doc. 36). On February 13, 2024, the Court held an evidentiary hearing.

BACKGROUND

**A. Lipscomb's Complaint and Motions**

On December 4, 2023, Lipscomb filed a motion to amend and request for temporary restraining order in the case *Lipscomb v. Rice, et al.*, Case No. 23-cv-2800-NJR

(Doc. 2). His motion raised new claims regarding an alleged sexual assault by Sergeant Kyle A. Brumleve. Although the claims were unrelated to the claims in his original lawsuit, given the serious nature of the allegations, the Court ordered a new case to be opened and directed that the motion to amend be filed in the new case as a motion for TRO (Doc. 1). Lipscomb was directed to inform the Court whether he wanted to pursue the claims as a new case and, if so, to file a formal Complaint (Doc. 3).

On December 28, 2023, Lipscomb filed a formal Complaint in this case (Doc. 10). Lipscomb's Complaint alleged that on November 20, 2023, after participating in an attorney call, he was walked back to his cell by correctional officer L. Korando (Doc. 10, p. 4). Korando informed Lipscomb that he was being placed in a cell with a steel door rather than the barred cell that Lipscomb had inhabited prior to his attorney call. Korando informed Lipscomb that Sergeant Brumleve and Lieutenant Moore ordered his placement in the new cell because Lipscomb recently wrote a letter to counselor Leah Strong about his access to electronics (*Id.*). Lipscomb declared a hunger strike and requested to speak with mental health staff. He was then placed in a mental health room to speak with staff. He informed mental health staff that he wanted to be placed on suicide watch because he felt like hurting himself as a result of alleged harassment by Brumleve.

While in the mental health room, Brumleve allegedly approached Lipscomb and threatened to kill him if Lipscomb refused his new cell placement (*Id.*). Brumleve accused Lipscomb of including "sexual stuff" in his letter to his counselor and stated that he was punishing Lipscomb without a formal disciplinary ticket. Brumleve threatened to hurt

Lipscomb and noted that Lipscomb was "lucky no one has sexual assaulted your ass" (*Id.* at p. 5). Sometime after Brumleve left the mental health room, another unnamed officer approached Lipscomb and threatened that something bad was going to happen to him (*Id.*). Lipscomb again declared a hunger strike and informed the officer he felt suicidal (*Id.*).

At some later point, while Lipscomb was still in the mental health room, Brumleve allegedly reentered the room and approached Lipscomb with a knife (*Id.*). Brumleve punched Lipscomb, held a knife to his throat, and threatened to kill him if he screamed (*Id.*). He then sexually assaulted Lipscomb (*Id.*). Lipscomb alleges that during the assault, Brumleve licked his neck. After the assault was over, Brumleve left the room.

Although Lipscomb informed correctional officers and mental health staff about the rape, they failed to help him. On November 28, 2023, he informed Jilian Crane about the rape while she made rounds through his cellhouse. Crane told him to shut up and threatened him, noting that there were other individuals who she could order to rape Lipscomb (*Id.*). In his motion for help (Doc. 9), Lipscomb alleged that on December 26, 2023, Jilian Crane told him that she would not provide him with medical care for his injuries (Doc. 9, p. 2). He also alleged that another officer had threatened him the same day by pulling a can of mace, pressing it against his genitals, and threatening to set them on fire if Lipscomb complained to anyone else about the assault (*Id.*). He also alleged that Anthony Wills failed to investigate the assault.

Lipscomb was allowed to proceed on several claims for violations of his constitutional rights and Illinois state law (Doc. 15, pp. 5-6). As part of his request for a

TRO, Lipscomb sought a transfer to another prison (Doc. 9, pp. 3, 6). Anthony Wills was directed to respond to the allegations raised in Lipscomb's motion for TRO (Doc. 2), motion for help (Doc. 9), and his Complaint (Doc. 10).

### B. Wills's Response

On January 11, 2024, Wills filed a response to the request for TRO (Doc. 21). Wills indicated that there was a pending investigation into Lipscomb's claims by Menard Correctional Center's Internal Affairs (Doc. 21, p. 4). Unfortunately, however, the response did not provide an update on the status or findings of that investigation. Instead, Wills argued that the request for injunctive relief should be denied because Lipscomb had not properly exhausted his administrative remedies as to the claim. He also argued that Lipscomb failed to demonstrate that he would suffer irreparable harm because he failed to offer any evidence that he had suffered mentally or physically as a result of the threats (*Id*. at p. 5).

### C. Lipscomb's Reply Brief

On February 6, 2024, Lipscomb filed a reply to Wills's responsive brief (Doc. 36). He alleged that he previously attempted to submit the brief, but the first brief was thrown in the trash by the defendants. Lipscomb alleged that Sergeant Brumleve was still in the same area of the prison as Lipscomb and able to make threats. He also stated that he had submitted a grievance to internal affairs, a letter to the John Howard Association, and reported his allegations to mental health staff. He argued those efforts should constitute exhaustion of his claims. He tried to exhaust his administrative remedies "as far as IDOC officials/Defendants allowed" (*Id*. at p. 4).

Lipscomb acknowledged that he was interviewed by internal affairs, but nothing was done about the situation (*Id*. at p. 5).[1] He alleged that he was still in the same area as Sergeant Brumleve and faced daily harassment (*Id*.). He also offered a personal affidavit stating that he was recently harassed by Brumleve. Specifically, on January 30, 2024, Brumleve came to Lipscomb's cell and stated that no one cared about his lawsuit and that his request for a temporary restraining order would not work (*Id*. at p. 7). Brumleve also vaguely threatened him, stating that he would have something for Lipscomb "real soon" (*Id*.).

Lipscomb also offered the affidavits of several other inmates from his cellhouse. Willie Hall stated in his affidavit that he overheard the statement Brumleve made to Lipscomb on January 30, 2024 (*Id*. at p. 8). He heard Brumleve say he had "something meaty for his ass hole" and that if anyone actually cared about his lawsuits and requests for injunctive relief then staff members would not be able to "treat[] you like a little black bitch." (*Id*.). Lorenzo Parish also attested to overhearing the same statements from Brumleve (*Id*. at p. 9). He also stated that this was the fifth or sixth time he overheard sexual insults directed at Lipscomb by correctional officers (*Id*.). Ike Larry, Jr. offered an identical affidavit (*Id*. at p. 10).

D. **Evidentiary Hearing**

On February 13, 2024, the Court held an evidentiary hearing and heard testimony from Lipscomb and Lieutenant Mark Hanks.

---

[1] His Complaint also made note of a December 24, 2023 interview with internal affairs (Doc. 10, p. 6).

### 1. *Lipscomb*

Lipscomb testified that after the attack, he filed an emergency grievance and sent a letter to the John Howard Association. He stated that his grievance was submitted to internal affairs, and he had been interviewed as part of an internal investigation. According to Lipscomb, the attack took place in the mental health room where he was placed after refusing to transfer to a cell with a solid door. He tried to tell mental health staff after the incident, but they either ignored him or made fun of him. He also stated that other individuals walked past the cell during the assault. Numerous officers walked in and out of the room threatening him. He testified the room was a large area where all of the staff, including mental health staff, sit during their shift. But he was in the one-on-one mental health room. He did not scream for help because Brumleve held a knife to his neck.

In regard to whether he had any additional contact with Brumleve, Lipscomb testified that Brumleve walks by his cell and makes threats. At the time of the hearing, Lipscomb was housed in North 2 on 5 Gallery. He testified that he believed 85-95% of the male staff at the prison were homosexuals. The staff do not like him talking to female staff, and they interrupt him anytime he tries to speak with a female nurse. He tries to stay covered up while on suicide watch because the officers watching him are homosexual. The officers are trying to watch him in the showers and when he urinates because they are homosexual. The officers also kiss, touch each other, and make sexual comments to each other in front of the inmates.

Lipscomb testified that he was currently on a hunger strike and suicide watch. He

also stated that he was accused of recent staff assaults. Prior to the hearing, he was hospitalized for self-harming and received stiches in his arm. He testified that mental health staff at the prison refuse to provide him with care, instead mocking him about his criminal and civil proceedings. He acknowledged that he was previously on medication for his mental illness and only recently restarted his prescribed medication. On his previous hunger strike he was not taking his medications but had been taking them since declaring his current hunger strike. His medications are for schizophrenia and bipolar disorder. He started accepting his medications a couple of days before the hearing.

Lipscomb acknowledged that he has schizophrenia, noting that all of his family, including his grandfather, mother, aunt, and sister, suffer from the condition. Lipscomb suffers from hallucinations and testified that he sometimes is unable to differentiate between reality and fantasy. He has events where he goes from one point to the next, not knowing how he got there. For example, he testified that he could be sitting reading and then he will be at the bars screaming and not know how he got there. He also believes that he communicates with spirits, particularly those he has pictures of in his possession. But he insisted that the event with Brumleve was real and not a product of his schizophrenia.

### 2. *Lieutenant Mark Hanks*

Lieutenant Hanks testified about the investigation into Lipscomb's sexual assault allegations. Lieutenant Hanks is the internal affairs supervisor at Menard tasked with conducting the investigation into Lipscomb's claims. At the time of the hearing, the investigation was an open and active case. Hanks interviewed Lipscomb and received a

letter from the John Howard Association regarding Lipscomb's claims. Hanks planned to interview Brumleve as part of his investigation but had not done so as of the day of the hearing.

Hanks testified that he found inconsistencies in Lipscomb's allegations. Hanks also testified that it would be rare for a sergeant to escort an individual on a call pass in the manner Lipscomb alleged occurred with Brumleve on the date of the alleged assault. The sergeant does not sit on the gallery but has an office in the infirmary area of the cellhouse. The sergeant rarely leaves his post unless there is something on the gallery that requires his attention. Hanks also testified that the room where the assault allegedly occurred is very small and barely fits two people. There is a desk and a stool in the room, and the doors are clear plexiglass for easy observation. The room lacks video surveillance because it is part of the infirmary and protected by privacy laws. But Hanks noted that Brumleve is not a small man, and it would be a tight fit in the room if both Brumleve and Lipscomb were together. Hanks also testified that it was unlikely that Brumleve could bring a knife into the prison as Lipscomb described. All employees must pass through a metal detector upon entering the facility, and he does not recall any staff ever smuggling a knife into the facility.

Hanks also testified that it was impossible to move Lipscomb to a different part of the prison during the pendency of the investigation. Lipscomb is in restrictive housing, and his aggression level is high. He was also recently disciplined for assaulting multiple staff members. Given his aggression level and disciplinary history, Lipscomb cannot be housed in any other part of the prison. And, because he is on suicide watch, there is a

correctional officer outside of his cell 24-hours a day. Hanks testified that normally during an investigation the inmate and the staff member would be separated, but there is no other place to house Lipscomb at Menard. But Hanks reiterated that it is rare for the sergeant to be on the gallery or interacting with Lipscomb.

### E. Additional Briefings

After the hearing, the defendants were given an opportunity to provide additional closing arguments by brief. Defendant Jilian Crane argued that Lipscomb's testimony was unrealistic, inconsistent, and impossible (Doc. 45). Crane argued that Lipscomb's explanation for staff's anger changed throughout his testimony. Again, Lipscomb testified that staff were upset about his prior crimes, they were all homosexuals who did not like him talking to female staff, or staff were upset about his prior lawsuits. Crane also pointed out that the room where the sexual assault allegedly occurred was a small room with a clear door. Crane also noted that Lipscomb's schizophrenia and his tendency to hallucinate could account for his allegations.

Anthony Wills argued that Lipscomb was unable to be moved from his current location because of his violent behavior (Doc. 46). Lieutenant Hanks submitted an additional affidavit stating that Lipscomb's behavior is violent and erratic, and he poses a danger to himself and others (Doc. 46-1, p. 1). As recently as February 6, 2024, Lipscomb attacked staff when they tried to move him to a different cell (*Id*.). He threatened the officers, cursed at them, and attempted to punch an officer. Lipscomb also spit on staff, hit another staff member, and threw apples at them (*Id*. at p. 2). On February 12, 2024, Lipscomb cut himself and was placed on a continuous watch (*Id*.). On February 14, 2024,

the watch was reduced to a ten-minute watch, but Lipscomb remains in crisis-watch on a ten-minute watch (*Id.*). He remains on 5 gallery in the North 2 cellhouse but is not on the same gallery as Brumleve. Hanks stated in his affidavit that Brumleve is assigned to even-numbered galleries in North 2, and it is highly unlikely that Brumleve would have interactions with Lipscomb (*Id.* at p. 3). Because of Lipscomb's aggression level and his recent violent behavior, he is unable to be housed in any other location in the prison (*Id.*). Hanks also stated that his investigation into Lipscomb's allegations are close to completion. He has interviewed Brumleve and is currently preparing his final report (*Id.* at p. 1).

## LEGAL STANDARDS

A temporary restraining order may issue without notice only if "specific facts in an affidavit or a verified complaint clearly show that immediate or irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." FED. R. CIV. P. 65(b)(1)(A). Such injunctive relief is also warranted "to prevent a substantial risk of serious injury from ripening into actual harm." *Farmer v. Brennan*, 511 U.S. 825, 845 (1994). The same legal analysis is used to determine whether a TRO or a preliminary injunction is warranted.

A preliminary injunction is an "extraordinary and drastic remedy" for which there must be a "clear showing" that a plaintiff is entitled to relief. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A Charles Alan Wright, Arthur R Miller, & Mary Kay Kane, Federal Practice and Procedure §2948 (5th ed. 1995)). The purpose of such an injunction is "to minimize the hardship to the parties pending the ultimate resolution of

the lawsuit." *Faheem-El v. Klincar*, 841 F.2d 712, 717 (7th Cir. 1988). A plaintiff has the burden of demonstrating (1) a reasonable likelihood of success on the merits; (2) no adequate remedy at law; and (3) irreparable harm absent the injunction. *Planned Parenthood v. Commissioner of Indiana State Dep't Health*, 699 F.3d 962, 972 (7th Cir. 2012).

As to the first hurdle, the Court must determine whether plaintiff's claim "has some likelihood of success on the merits." *Mays v. Dart*, 974 F.3d 810, 822 (7th Cir. 2020). Once a plaintiff has met his burden, the Court must weigh "the competing harms to the parties if an injunction is granted or denied and also consider[] the public interest." *Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013). "This equitable balancing proceeds on a sliding-scale analysis; the greater the likelihood of success of the merits, the less heavily the balance of harms must tip in the moving party's favor." *Id*. In addition, the Prison Litigation Reform Act provides that a preliminary injunction must be "narrowly drawn, extend no further than necessary to correct the harm . . . ," and "be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2). A request for a mandatory injunction like the one requested by Lipscomb, which requires "an affirmative act by the defendant," are "ordinarily cautiously viewed and sparingly issued." *Mays*, 974 F.3d at 818 (quoting *Graham v. Medical Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997)). Finally, pursuant to Federal Rule of Civil Procedure 65(d)(2), a preliminary injunction would bind only the parties, their officers or agents, or persons in active concert with the parties or their agents.

## ANALYSIS

Simply put, Lipscomb fails in his burden of demonstrating that he is entitled to

injunctive relief at this time. Although Lipscomb testified in detail about the alleged assault by Brumleve, Lipscomb's testimony was questionable as to certain aspects of the assault. The room where the alleged assault took place is small and has a clear, plexiglass door. The fact that no one saw or reported the assault seems unlikely. Lipscomb also testified that Brumleve had a knife. This too is unlikely, however, because Lieutenant Hanks testified that all staff walk through a metal detector before every shift. Lieutenant Hanks was unaware of a staff member ever sneaking a knife into the facility. The logistics of the cellhouse, the presence of other staff, and the security measures at the prison refute Lipscomb's testimony of how and where the assault occurred.

Lipscomb also offered other far-fetched allegations that undermined his credibility. He testified that nearly 90% of the staff are homosexuals and flaunt their homosexuality openly with each other in front of Lipscomb. He also testified that staff are upset with him for various reasons and raised a vast conspiracy of staff members trying to harm him. His testimony was simply unbelievable.

Further, Lipscomb acknowledged that he suffers from schizophrenia, noting that he is sometimes unable to differentiate between reality and fantasy. He also acknowledged that he went without his medication on numerous occasions. The fact that he suffers from delusions and was without his medication further undermines his credibility.

Even if there was some truth to his allegations, which the Court does not find likely, Lipscomb has not shown that he will suffer irreparable harm absent an injunction. The requirement of irreparable harm requires that the plaintiff show "that irreparable

injury is *likely* in the absence of an injunction." *Mays*, 974 F.3d at 822. Lipscomb is currently on crisis watch and has been since early February. He was previously on continuous watch but is still on a 10-minute watch, meaning that an officer is checking on him every ten minutes. It is unlikely that Brumleve or any other staff member would attempt an assault when Lipscomb is under constant surveillance. Further, the administration at Menard has taken his allegations seriously. Lieutenant Hanks testified that he was investigating the matter and in his recent affidavit, he stated that he was preparing his final report.

It also appears that Brumleve and Lipscomb are not on the same gallery and interactions between the two are unlikely. Hanks testified that, as a sergeant, Brumleve is rarely on the gallery floor. The sergeant has a desk in the infirmary area of the gallery and rarely leaves that office. Further, Hanks indicated in his affidavit that Lipscomb is located on 5 gallery in North 2, and Brumleve is assigned to even-numbered galleries in North 2. Thus, Brumleve is not assigned to Lipscomb's gallery, and it would be unlikely that Brumleve would be on Lipscomb's gallery at any point.

Finally, there is simply no other place to house Lipscomb in order to avoid all potential interaction with Brumleve. It is clear that Lipscomb has psychological and behavioral issues that prevent him from being moved to another part of the prison. He is currently on suicide watch, has previously self-harmed, and recently attacked guards. Lieutenant Hanks testified at both the hearing and in his affidavit that given his aggression level and recent violent behavior, there is no other place where Lipscomb could be housed at Menard. He can only be housed in North 2. But he is not currently on

a gallery which Brumleve supervises, and there is no indication that the two will have further interactions. Thus, the Court finds that the extraordinary request of transferring Lipscomb to another prison or another area of Menard is not only unwarranted but is impossible given Lipscomb's aggression level and history.

## CONCLUSION

For the reasons stated above, Lipscomb's motion for TRO (Doc. 2) is **DENIED**.

**IT IS SO ORDERED.**

DATED: March 7, 2024

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**