## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

KEON V. LIPSCOMB,

      Plaintiff,

v.

                                      Case No. 23-cv-3959-NJR

ANTHONY WILLS, JILIAN CRANE,
and KYLE A. BRUMLEVE,

      Defendants.

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Plaintiff Keon V. Lipscomb, an inmate of the Illinois Department of Corrections who is currently incarcerated at Pontiac Correctional Center, brings this action for deprivations of his constitutional rights pursuant to 42 U.S.C. § 1983. Lipscomb's Complaint alleges claims of sexual assault, excessive force, deliberate indifference, and retaliation, in violation of the First and Eighth Amendments, for events that took place when he was housed at Menard Correctional Center in 2023. He also alleges claims under Illinois state law.

This matter is before the Court on motions for summary judgment filed by Defendants Jilian Crane, Kyle Brumleve, and Anthony Wills (Docs. 57, 58, and 69). Lipscomb filed responses to the motions (Docs. 62, 70). Defendants Brumleve and Wills filed a reply brief (Doc. 71). Lipscomb filed a "second response" that is a sur-reply (Doc. 75). Sur-reply briefs are not accepted under any circumstances. *See* SDIL Local Rule

7.1 (a)(4). Thus, Lipscomb's sur-reply (Doc. 75) is **STRICKEN**. On February 6, 2025, the Court held an evidentiary hearing pursuant to *Pavey v. Conley*, 544 F.3d 739, 740-41(7th Cir. 2008).

BACKGROUND

A. Procedural Background

Lipscomb originally raised the allegations that form the basis of his claims in this case in a motion to amend and request for temporary restraining order filed in the case *Lipscomb v. Rice, et al.*, Case No. 23-cv-2800-NJR, on December 4, 2023 (Doc. 23). Because the claims were unrelated to the claims in his original lawsuit, the Court opened a new case and directed Lipscomb to file a formal Complaint if he wanted to proceed with the claims (Doc. 1).

On December 28, 2023, Lipscomb filed a formal Complaint (Doc. 10). It alleged that on November 20, 2023, after participating in an attorney call, he was walked back to his cell by correctional officer Lance Korando (Doc. 10, p. 4). Korando informed Lipscomb that he was being placed in a cell with a steel door due to an order from Sergeant Kyle Brumleve and Lieutenant Moore (*Id.*). In response, Lipscomb declared a hunger strike and asked to speak with mental health staff. He was placed in a mental health room and informed staff that he wanted to be placed on suicide watch because he felt like hurting himself as a result of alleged harassment by Brumleve.

While in the mental health room, Brumleve allegedly approached Lipscomb and threatened to kill him if Lipscomb refused his new cell placement (*Id.*). Brumleve accused Lipscomb of including "sexual stuff" in his letter to his counselor and stated that he was

2

punishing Lipscomb without a formal disciplinary ticket. Brumleve threatened to hurt Lipscomb and noted that Lipscomb was "lucky no one has sexual assaulted your ass" (*Id.* at p. 5). At some later point, while Lipscomb was still in the mental health room, Brumleve allegedly re-entered the room and approached Lipscomb with a knife (*Id.*). Brumleve punched Lipscomb, held a knife to his throat, and threatened to kill him if he screamed (*Id.*). He then sexually assaulted Lipscomb (*Id.*). Lipscomb alleged that during the assault, Brumleve licked his neck. After the assault was over, Brumleve left the room.

On November 28, 2023, Lipscomb informed Jilian Crane about the rape while she made rounds through his cellhouse. Crane told him to shut up and threatened him, noting that there were other individuals who she could order to rape Lipscomb (*Id.*).

After a review of the Complaint pursuant to 28 U.S.C. § 1915A, Lipscomb was allowed to proceed on the following counts:

Count 1:    Kyle Brumleve sexually assaulted and used excessive force against Lipscomb in violation of the Eighth Amendment.

Count 2:    Illinois state law claim for assault and battery against Brumleve for the assault.

Count 3:    Jilian Crane verbally harassed Lipscomb after the assault and refused to report the assault in violation of the Eighth Amendment.

Count 4:    Illinois state law claim for intentional infliction of emotional distress against Brumleve and Crane for the rape and continued threats of rape.

Count 5:    Eighth Amendment failure to protect claim against Crane for failing to protect Lipscomb from future assault.

Count 6:    Eighth Amendment deliberate indifference claim against
Crane for failing to provide medical care to Lipscomb after
the assault.

Count 7:    First Amendment retaliation claim against Crane for
threatening Lipscomb and failing to provide him with
medical care in retaliation for Lipscomb filing grievances and
lawsuits.

(Doc. 10, p. 5-6).

Anthony Wills remained in the case, in his official capacity only, for implementing

any injunctive relief awarded to Lipscomb.

Lipscomb filed only one grievance relevant to his claims.

**December 18, 2023 Grievance (#K4-1223-2230):**
Lipscomb submitted a grievance regarding the allegations in his
Complaint (Doc. 67-4). The grievance alleged that Brumleve sexually
assaulted Lipscomb on November 20 (*Id*. at p. 1). He alleged that he was
denied medical treatment by staff after the assault (*Id*.). He also informed
mental health personnel, but they denied his request to file a PREA report
(*Id*. at pp. 1-2). The grievance also alleged that on November 28, 2023, Crane
threatened to have an officer rape Lipscomb (*Id*. at p. 2). Lipscomb further
alleged that he tried to file a grievance after the incident and asked mental
health provider Conner to help him file a grievance, but she refused (*Id*.).
She told him to talk to a counselor (*Id*.). He asked mental health provider
Elderman to help him file a grievance and she said she would report his
complaints (*Id*.). Lipscomb noted in the grievance that he wrote a letter to
the John Howard Association about the rape (*Id*.).
On December 27, 2023, Lipscomb's grievance was received by the
grievance officer and forwarded to the Chief Administrative Officer
("CAO") to determine if it would be handled as an emergency (Doc. 69-5,
p. 1). On December 28, 2023, the CAO deemed the grievance an emergency
and forwarded it for expedited review (*Id*.). The grievance was emailed to
internal affairs and the PREA coordinator (Doc. 58-2, pp. 22-24).
On July 8, 2024, the grievance officer issued her recommendation
regarding Lipscomb's claims. She noted that the grievance was forwarded
to the PREA Compliance Manager and Internal Affairs for investigation
(Doc. 70, pp. 7-8). Internal Affairs opened a case (*Id*.). The grievance was

4

also forwarded to the healthcare unit for review (*Id.* at p. 8). On July 5, 2024,[1]
Healthcare Unit Administrator Angela Crain responded that Lipscomb was
seen by a provider on December 19, 2023, and January 20, 2024 (*Id.* at p.
11).[2] He was also prescribed Neurontin for nerve pain on February 21, 2024
(*Id.*). The grievance officer noted that medical issues were appropriately
addressed, and Lipscomb would be notified of the PREA investigation
findings (*Id.* at p. 7).

On July 8, 2024, the CAO agreed with the decision (*Id.*). On July 24,
2024, Lipscomb marked the grievance for an appeal to the Administrative
Review Board ("ARB") (*Id.*). At the time of Lipscomb's filing, the ARB had
not returned the grievance.

In addition to Lipscomb's grievance, a PREA investigation into Lipscomb's claims
was opened by the prison on December 20, 2023 (Doc. 69-6). The investigative report
noted that an investigation was opened based on an email from Lipscomb to the John
Howard Association (*Id.* at p. 1). On December 7, 2023, the organization forwarded the
email to Anthony Wills (*Id.*). On December 20, 2023, Wills directed that an investigation
into the allegations be opened (*Id.*). The investigative report also noted that the grievance
officer received Grievance # K4-1223-2230 regarding the alleged rape (*Id.*). The report
ultimately found Lipscomb's claims to be unsubstantiated (*Id.* at p. 2). The report does
not indicate the date that the investigation was closed, but the last action by investigators
was the interview of Brumleve which occurred on February 20, 2024 (*Id.*).

Defendants argue that Lipscomb failed to exhaust his administrative remedies
prior to filing the formal Complaint in this case. Although Lipscomb filed a grievance on

---

[1] The grievance response states that the attached memo from Angela Crain was dated July 19,
2023, but the memo from Crain is actually dated July 5, 2024 (Doc. 70, p. 11).
[2] The memorandum from Angela Crain actually states that Lipscomb was seen on January 20,
2023, but the date appears to be a misprint.

December 18, 2023, he filed his formal pleading in this case on December 28, 2023, well before he had fully exhausted his administrative remedies.

In response, Lipscomb argues that he did not have to exhaust his claims because he was faced with ongoing harassment and the Court decided to open a new case, even though Lipscomb alleges that the actions stemmed from his previous case (Doc. 70, p. 2). He notes that he was only given a week to determine whether he wanted to proceed with the case but had filed a grievance prior to proceeding (*See* Docs. 1, p. 3; 70, p. 1). Further, Lipscomb argues that he tried to file grievances earlier, but staff members trashed them. Lipscomb argues that the lack of the December grievance in his file supports his allegations that his grievances were destroyed. Lipscomb also argues that he informed staff about his allegations, but they refused to email or otherwise inform the warden.

As to the grievance Lipscomb submitted on December 18, 2023, he alleges that the grievance ultimately disappeared. He points to Crane's motion where she notes that her counsel was unable to locate a copy of the December grievance in Lipscomb's grievance file (Doc. 58, p. 5). In response to Brumleve's motion, however, Lipscomb acknowledges that he eventually received a response six months later (Doc. 70, pp. 2, 7-8). He argues that because it took so long to receive a response, his very serious allegations of rape were not being addressed, and he needed to proceed with his Complaint due to fears for his safety (*Id*. at p. 2). He also claims that he feared for his life and safety at the time he filed his Complaint (*Id*.). Lipscomb also argues that he informed mental health staff about his allegations, but he did not have access to a pen or paper on crisis watch, staff refused to

assist him in filing a grievance, and Warden Wills would have been aware of his allegations from his complaints to staff members and the John Howard Association.

**B. Evidentiary Hearing**

At the evidentiary hearing, the Court heard testimony from Lipscomb, Jeffrey Olson, and Ryan Nothnagle.

*1. Lipscomb's Testimony*

Lipscomb testified as to his attempts to file grievances related to his claims in this case. He testified that he was constantly filing grievances. Any time that he was not on crisis watch and had a chance to file a grievance, he would file one. He was being harassed and was filing numerous grievances. Then he was told that he would not receive grievance forms or receive help to file grievances because of the grievances he was filing. Lipscomb believed that he filed a couple of grievances about the sexual assault by Brumleve. Anytime a medical staff member walked past his cell, he asked for medical care but his request was denied. In response, he would file a grievance for each interaction with medical staff.

Lipscomb testified that he filed an earlier grievance that disappeared and was not in his grievance records. In his subsequent grievance, he believed he was stating what he initially wrote in the prior grievance. Lipscomb testified that his normal practice when a grievance was thrown in the trash by officials was to file a subsequent grievance explaining that the first one was destroyed and then stating the contents of the missing grievance. Lipscomb testified that he saw staff throw his grievances away because the hallway where officers and nurses congregated was right outside of his cell. Further, staff

would tell him that his grievances were destroyed because they were upset that he was filing lawsuits.

Lipscomb further testified that the grievance process was unavailable to him because staff would not help him file grievances and they would not allow any other person to help him file a grievance. Staff also told him that they would not give him grievance forms. Lipscomb later clarified that he was referring to the time he was on crisis watch from February 22, 2024, until August 27, 2024. He later testified that he remembered he was filing a lot of grievances, and he immediately went to court because staff were not helping him with his grievances. He believed that he missed the first grievance and ended up submitting a second one because he did not have access to grievances. He also told mental health staff that he needed to file a grievance, and they told him that everything he wrote down was being reported to the warden. He believed the warden was the one who was supposed to fix everything, and Lipscomb was reporting everything to staff in order to relay the information to the warden. And then when he got off crisis watch, Lipscomb would immediately file a grievance for whatever the situation was he was dealing with at the time.

Lipscomb further testified that officers brought around boxes to collect grievances, and nine times out of ten the officer put the grievance in the box. But he also testified that officers threw his grievances in the trash. At some unknown point, he sent his grievances to another individual who turned them in. He noted that he either put his grievance in the box or gave it to another inmate to turn in for him. Lipscomb testified that he was aware that his grievances were being thrown in the trash because he saw it right in front

8

of him and that his area was not a peaceful setting; he was in a very hostile environment. He testified that he asked for help writing grievances, but later acknowledged that those requests were in February 2024. He also stated that he filed his lawsuit prior to submitting a grievance because he did not know when he would be off of crisis watch and able to file a grievance.

### 2. *Jeffrey Olson*

Jeffrey Olson, a correctional counselor at Menard, testified about how grievances are logged when they are received by the grievance officer. He testified that all grievances received by the grievance officer are reviewed and then logged into an Excel program. In reviewing the grievance log for Lipscomb's grievances filed between September and December 28, 2023. Olson noted that there were six grievances on the log (*See also* Doc. 58-2, p. 22). As to Lipscomb's December 18, 2023 grievance (#K4-1223-2230), it was logged as received by the grievance office on December 21, 2023. It was marked an emergency and sent to the warden to determine whether it would be deemed an emergency or not; it ultimately was deemed an emergency. Olson testified that Lipscomb was sent a receipt for the grievance on December 21, 2023 (*Id*.).

Olson noted that the grievance was reviewed by grievance officer Kelly Pierce on December 27, 2023. On July 9, 2024, the warden signed off on the grievance, and it was returned to Lipscomb on July 11, 2024.

Olson testified that when an inmate is on crisis watch, he is not allowed a pen for safety reasons. But an inmate has access to the grievance process through his counselor or another staff member who will write down the inmate's complaint on the grievance

and submit it on his behalf. If an inmate believed his grievance was lost, he could inquire about the status of the grievance from staff.

Olson acknowledged that the response to Lipscomb's grievance took longer than usual. He noted that inmates are encouraged to focus on one main point in a grievance. When an inmate includes multiple issues in one grievance, it can take longer to receive a response from each involved party. Olson noted that Lipscomb's grievance included a medical issue that required a response from medical staff. Although the grievance officer submitted Lipscomb's grievance to medical staff right away, the officer did not receive a response from medical staff until July 5, 2024. Olson noted that the medical unit is sometimes slow in responding, and the prison administration is trying to address the issue. But it is ultimately out of the grievance officer's hands as to when medical staff respond to the grievance because the grievance officer has to wait for a response to demonstrate that the grievance was properly researched.

Olson testified that the grievance office received three grievances from Lipscomb in December 2023 (*See also* Doc. 58-2, p. 22). He further testified that the grievance process was available to Lipscomb, and he was able to submit grievances. Olson testified that when Lipscomb submitted his December 18, 2023 grievance, he was housed in North 2, 4 Gallery. Lipscomb was not on crisis watch at the time.

### 3. *Ryan Nothnagle*

Ryan Nothnagle is the ARB chairperson. He testified that he never received Lipscomb's December 18, 2023 grievance for review. He acknowledged receiving a copy of another grievance from Lipscomb, Grievance #K4-0124-0382, that was rejected because

it was a duplicate of Lipscomb's December 18 grievance, and duplicates are not allowed per administrative rules. Lipscomb was directed to send his December 18 grievance to the ARB for review.

## LEGAL STANDARDS

"Summary judgment is proper if the pleadings, discovery materials, disclosures, and affidavits demonstrate no genuine issue of material fact such that [the defendant] is entitled to judgment as a matter of law." *Wragg v. Village of Thornton*, 604 F.3d 464, 467 (7th Cir. 2010). Lawsuits filed by inmates are governed by the provisions of the Prison Litigation Reform Act ("PLRA"). 42 U.S.C. §1997e(a). That statute states, in pertinent part, that "no action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." *Id*. The Seventh Circuit requires strict adherence to the PLRA's exhaustion requirement. *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006) (noting that "[t]his circuit has taken a strict compliance approach to exhaustion"). Exhaustion must occur before the suit is filed. *Ford v. Johnson*, 362 F.3d 395, 398 (7th Cir. 2004). A plaintiff cannot file suit and then exhaust his administrative remedies while the suit is pending. *Id*. Moreover, "[t]o exhaust remedies, a prisoner must file complaints and appeals in the place, and at the time, the prison administrative rules require." *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2005). Consequently, if a prisoner fails to properly utilize a prison's grievance process, "the prison administrative authority can refuse to hear the case, and the prisoner's claim can be indefinitely unexhausted." *Dole*, 438 F.3d at 809.

11

Under *Pavey v. Conley*, 544 F.3d 739, 740-41(7th Cir. 2008), the Seventh Circuit held that "debatable factual issues relating to the defense of failure to exhaust administrative remedies" are not required to be decided by a jury but are to be determined by the judge. Thus, where failure to exhaust administrative remedies is raised as an affirmative defense, the Seventh Circuit set forth the following recommendations:

> The sequence to be followed in a case in which exhaustion is contested is therefore as follows: (1) The district judge conducts a hearing on exhaustion and permits whatever discovery relating to exhaustion he deems appropriate. (2) If the judge determines that the prisoner did not exhaust his administrative remedies, the judge will then determine whether (a) the plaintiff has failed to exhaust his administrative remedies, and so he must go back and exhaust; (b) or, although he has no unexhausted administrative remedies, the failure to exhaust was innocent (as where prison officials prevent a prisoner from exhausting his remedies), and so he must be given another chance to exhaust (provided that there exist remedies that he will be permitted by the prison authorities to exhaust, so that he's not just being given a runaround); or (c) the failure to exhaust was the prisoner's fault, in which event the case is over. (3) If and when the judge determines that the prisoner has properly exhausted his administrative remedies, the case will proceed to pretrial discovery, and if necessary a trial, on the merits; and if there is a jury trial, the jury will make all necessary findings of fact without being bound by (or even informed of) any of the findings made by the district judge in determining that the prisoner had exhausted his administrative remedies.

*Id.* at 742.

### A. Illinois Exhaustion Requirements

As an IDOC inmate, Lipscomb was required to follow the regulations contained in IDOC's Grievance Procedures for Offenders ("grievance procedures") to properly exhaust his claim. 20 Ill. Administrative Code §504.800 *et seq*. The grievance procedures first require inmates to file their grievance with the counselor within 60 days of the discovery of an incident. 20 Ill. Admin. Code §504.810(a). The grievance form must:

12

contain factual details regarding each aspect of the offender's complaint, including what happened, when, where and the name of each person who is the subject of or who is otherwise involved in the complaint. This provision does not preclude an offender from filing a grievance when the names of individuals are not known, but the offender must include as much descriptive information about the individual as possible.

20 Ill. Admin. Code §504.810(c). Grievances that are unable to be resolved through routine channels are then sent to the grievance officer. 20 Ill. Admin. Code §504.820(a). The Grievance Officer will review the grievance and provide a written response to the inmate. 20 Ill. Admin. Code §504.830(a). "The Grievance Officer shall consider the grievance and report his or her findings and recommendations in writing to the [CAO] within two months after receipt of the grievance, when reasonably feasible under the circumstances." 20 Ill. Admin. Code §504.830(e). "The [CAO] shall review the findings and recommendation and advise the offender of his or her decision in writing." *Id.*

If the inmate is not satisfied with the CAO's response, he or she can file an appeal with the Director through the ARB. The grievance procedures specifically state, "[i]f, after receiving the response of the [CAO], the offender still believes that the problem, complaint or grievance has not been resolved to his or her satisfaction, he or she may appeal in writing to the Director. The appeal must be received by the Administrative Review Board within 30 days after the date of the decision." 20 Ill. Admin. Code §504.850(a). The inmate shall attach copies of the Grievance Officer's report and the CAO's decision to his appeal. *Id.* "The Administrative Review Board shall submit to the Director a written report of its findings and recommendations." 20 Ill. Admin. Code §504.850(d). "The Director shall review the findings and recommendations of the Board

and make a final determination of the grievance within six months after receipt of the appealed grievance, when reasonably feasible under the circumstances. The offender shall be sent a copy of the Director's decision." 20 Ill. Admin. Code §504.850(e).

The grievance procedures allow for an inmate to file an emergency grievance. In order to file an emergency grievance, the inmate must forward the grievance directly to the CAO who may "[determine] that there is a substantial risk of imminent personal injury or other serious or irreparable harm to the offender" and thus the grievance should be handled on an emergency basis. 20 Ill. Admin. Code §504.840(a). If the CAO determines the grievance should be handled on an emergency basis, then the CAO "shall expedite processing of the grievance and respond to the offender" indicating to him what action shall be taken. 20 Ill. Admin. Code §504.840(b). If the CAO determines the grievances "should not be handled on an emergency basis, the offender shall be notified in writing that he or she may resubmit the grievance as non-emergent, in accordance with the standard grievance process." 20 Ill. Admin. Code §504.840(c). When an inmate appeals a grievance deemed by the CAO to be an emergency, "the Administrative Review Board shall expedite processing of the grievance." 20 Ill. Admin. Code §504.850(f).

## Analysis

Lipscomb acknowledges that he did not fully exhaust his administrative remedies before filing his Complaint in this case. The case was opened on December 18, 2023, in response to a motion filed in *Lipscomb v. Rice*, Case No. 23-cv-2800-NJR (Doc. 23). Lipscomb filed a formal Complaint in the case on December 28, 2023 (Doc. 10). Prior to filing that pleading, he submitted an emergency grievance on December 18, 2023, but he

did not have a response to the grievance at the time he filed his formal Complaint. Lipscomb offers a number of excuses as to why he decided to file his Complaint before fully exhausting his administrative remedies.

Lipscomb first argues that he was facing ongoing harassment that stemmed from Case No. 23-cv-2800-NJR, and thus he did not need to file an additional grievance. An inmate does not need to "file multiple, successive grievances raising the same issue (such as prison conditions or policies) if the objectionable condition is continuing." *Turley v. Rednour*, 729 F.3d 645, 650 (7th Cir. 2013). "Separate complaints about particular incidents are only required if the underlying facts or the complaints are different." *Id*. But the underlying facts in this case are different from the facts in Case No. 23-cv-2800-NJR. Lipscomb's claims in Case No. 23-cv-2800-NJR were about his treatment while on a hunger strike and his medical care related to self-harm attempts. His claims in this case stemmed from an alleged sexual assault by Kyle Brumleve and harassment by Jilian Crane regarding the assault. In fact, the Court opened a new case for Lipscomb's motion because his claims were different and unrelated to his claims in his previous case. His claim in this case involved different staff members and different events. As such, his claims were not the same issue, and he was required to exhaust his administrative remedies as to these new claims.

Lipscomb also argues that he tried to file a previous grievance before his December 18 grievance, but the grievance was destroyed. In essence, Lipscomb argues that he was thwarted in his attempts to exhaust his grievance, and the grievance process was unavailable to him. *Ross v. Blake*, 578 U.S. 632, 644 (2016) (Administrative remedies can

15

be unavailable "when prison administrators thwart inmates from taking advantage of a grievance process."). *See also Walker v. Sheahan*, 526 F.3d 973, 979 (7th Cir. 2008); *Dole*, 438 F.3d at 809. But Lipscomb's testimony was not credible. Instead, it was confusing, convoluted, and repetitive. He often confused dates when discussing his attempts to file grievances. He acknowledged on several occasions that he was talking about a different time period than the one at issue in this case. At one point, he discussed his ability to file grievances while on crisis watch, but later acknowledged he was talking about his time on crisis watch in 2024. In cross-examining Jeffrey Olson about his grievance, he acknowledged that he was not on crisis watch at the time he filed his December 18, 2023 grievance. He often testified in vague terms, noting that he was always and/or constantly filing grievances and that he submitted lawsuits quickly because he did not receive responses. He also was unable to offer specifics about when he submitted this earlier grievance. Nor was he able to offer any specifics about his belief that the grievance was destroyed. Further, there is no evidence in the record to support Lipscomb's contention that he filed an earlier grievance that was lost or destroyed.

Lipscomb further argues that he was denied access to the grievance process because he was on crisis watch, did not have access to a pen or paper, and asked for help filing a grievance to no avail. But Lipscomb's testimony on this point was also contradictory. He testified that he was on crisis watch and denied access to writing materials but later acknowledged he was not on watch at the time that he filed his December 18 grievance. He also testified that he was unable to file a grievance due to lack of help from staff, but then testified that he filed an earlier grievance. Further, the

grievance logs reflect that Lipscomb was able to and, in fact, did file numerous grievances during the relevant time period: six grievances from September through December 2023, and three grievances in the month of December (Doc. 58-2, p. 22). Lipscomb clearly had access to grievance forms and was able to file grievances.

Finally, Lipscomb argues that he feared for his life and did not have time to wait for a response to his grievance. Although imminent danger can make the grievance process unavailable, there is simply no evidence to support Lipscomb's claim. *Fletcher v. Menard Corr. Ctr.*, 623 F.3d 1171, 1173 (7th Cir. 2010) ("[i]f a prisoner has been placed in imminent danger of serious physical injury by an act that violates his constitutional rights, administrative remedies that offer no possible relief in time to prevent the imminent danger from becoming an actual harm can't be thought available."). Lipscomb's original motion for temporary restraining order was denied in this case, in part because there was no evidence that harm was likely in the absence of an injunction (Doc. 51, pp. 12-13). The allegations of sexual assault were being investigated, and Brumleve's interactions with Lipscomb were limited (*Id.* at p. 13). There was simply no evidence to support the contention that Lipscomb faced imminent harm. Further, Lipscomb was aware that his December 18 grievance was received by the grievance officer and was being investigated. In fact, Counselor Olson testified that a receipt was sent to Lipscomb, noting that the grievance was received and under review (Doc. 58-2, p. 22). Although Lipscomb now argues that he did not receive an actual response to his grievance until July 2024, there is no evidence to suggest that Lipscomb thought there would be delays in a response at the time he filed his Complaint. In fact, Lipscomb filed

his formal Complaint in this case a mere *ten days* after submitting his grievance (Doc. 10). Thus, Lipscomb did not even attempt to let the grievance process proceed before filing his lawsuit. Lipscomb filed this case too soon and clearly failed to exhaust his administrative remedies before he did so.

## CONCLUSION

For the reasons stated above, the motion for summary judgment filed by Jilian Crane (Docs. 57, 58) and the motion for summary judgment filed by Anthony Wills and Kyle Brumleve (Doc. 69) are **GRANTED**. Keon Lipscomb's federal claims (Count 1, 3, 5, 6, and 7) are **DISMISSED without prejudice**.

As to the remaining state law claims (Counts 2 and 4), the Court relinquishes supplemental jurisdiction over those claims. *See* 28 U.S.C. § 1367(c)(3); *Hansen v. Bd. of Trs. of Hamilton Se. Sch. Corp.*, 551 F.3d 599, 607 (7th Cir. 2008) ("When all federal claims have been dismissed prior to trial, the principle of comity encourages federal courts to relinquish supplemental jurisdiction pursuant to [Section] 1367(c)(3)."). Those claims are also **DISMISSED without prejudice**.

The Clerk of Court is **DIRECTED** to enter judgment accordingly and close the case.

**IT IS SO ORDERED.**

**DATED:  February 24, 2025**

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**